2020 IL App (2d) 180939-U
No. 2-18-0939
Order filed July 28, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of DeKalb County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 11-CF-740 |
| JIMMY REISS, | ) ) | Honorable William P. Brady, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BRENNAN delivered the judgment of the court.
Justices Jorgensen and Bridges concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court properly granted the State's motion to dismiss defendant's claim of actual innocence at the second-stage postconviction proceeding where a witness's recanted testimony in an affidavit did not constitute a substantial showing of actual innocence. The trial court also properly denied defendant relief on his ineffective assistance of counsel claims after a third-stage evidentiary hearing because defendant failed to make a substantial showing that, but for trial counsel's errors, the result of the second trial would have been different.

¶ 2    Defendant Jimmy Reiss appeals from the dismissal of his actual innocence claim at a second-stage postconviction proceeding and the denial of relief from his ineffective assistance of counsel claim after a third-stage evidentiary hearing.  For the following reasons, we affirm.

¶ 3                                I. BACKGROUND

¶ 4     Defendant was charged with two counts of predatory criminal sexual assault of a child in that, on September 17, 2011, defendant committed acts of sexual penetration by placing his finger in and placing his mouth on seven-year-old G.S.'s sex organ. See 720 ILCS 5/11–1.40(a)(1) (West Supp. 2011). G.S. was defendant's fiancé's niece. Defendant was also charged with two counts of aggravated criminal sexual abuse in that, on the same date, he committed acts of sexual conduct for his arousal by fondling G.S's sex organ and rubbing her feet on his penis. See 720 ILCS 5/11–1.60(c)(1) (West Supp. 2011). The first trial resulted in a mistrial when the jury could not reach a unanimous verdict. A subsequent jury trial resulted in convictions of all four counts, and the trial court imposed an aggregate prison term of 18 years.

¶ 5     On direct appeal, defendant argued: (1) defense counsel rendered ineffective assistance for failing to call Jack, his fiancé's nephew, as a witness; (2) the trial court erred in admitting the statements of G.S. to a doctor in the emergency room on the morning after the incident; and (3) the State failed to prove defendant guilty beyond a reasonable doubt. This court affirmed defendant's convictions. *People v. Reiss*, 2015 IL App (2d) 140488-U.

¶ 6     As the details underlying defendant's convictions are fully described in our judgment affirming defendant's convictions on direct appeal, we recount only those facts relevant to the instant appeal.

¶ 7                                A. First Trial

¶ 8     Defendant's first trial was in April of 2013.  At trial defendant testified that on September 17, 2011, he arrived at the townhome he shared with his fiancé Kendra and their 3-year-old son Noah around 4 p.m.  Two of Kendra's children from a previous relationship, Andrew and Thomas, also lived with them. Four of Kendra's nieces and nephews were also at the house that day: G.S.,

Kayla, Jack and Graham. Kendra and her sister Karlene, who was G.S. and Graham's mom, went out that evening to celebrate their birthdays. Though defendant was supposed to go with them, he stayed home complaining that he was tired and did not feel well. All the aforementioned nieces and nephews spent that night at defendant and Kendra's house.

¶ 9    Defendant and Kendra's townhome had three levels. It had a basement, a main floor with a bedroom, and an upstairs level with two bedrooms. Defendant and Kendra slept in one of the upstairs bedrooms. For the night in question, it was disputed whether Andrew, Thomas and Noah all slept in the second upstairs bedroom, or whether Andrew instead slept in the bedroom on the main floor. The second bedroom on the upstairs level had two loft beds with ladders to reach the beds. The mattresses were about two feet from the ceiling.

¶ 10    Defendant testified that he watched television in the living room on the main level and at one point he checked the upstairs bedroom that Thomas and Noah shared. Defendant played with Noah and G.S. in that room, tickling them and blowing raspberries on their stomachs. He then went downstairs to watch more television with the other children.

¶ 11    Defendant said that he and 16-year-old Kayla put the children to bed around 9:30 p.m., and he sent Andrew downstairs to his bedroom on the main floor. He told G.S. to sleep in one of the lofted beds and for Noah and Thomas to share the other lofted bed. Defendant went downstairs and the three children followed him about 30 minutes later. Defendant later took G.S., Graham and Noah back upstairs and put them to bed.

¶ 12    Defendant admitted that he climbed up the ladder and got into bed with G.S. while the children watched a movie. He partially laid back on the mattress with his feet on the ladder, but he denied lying down with G.S. Noah asked for his feet to be rubbed so he stood between the lofted beds and rubbed lotion onto G.S. and Noah's feet. Noah and defendant eventually went to

sleep in the master bedroom. Defendant denied having any contact with G.S.'s vaginal area, placing his penis on any part of her body, or removing her clothing.

¶ 13    G.S. testified that one night, she, Graham and some of her cousins were sleeping over at her Aunt Kendra's house and she was in one of the loft bed upstairs. G.S. said that she was sleeping when defendant climbed into bed with her, pulled her pants down to her ankles and touched her bare skin on her "china" or "peeper" both inside and outside with his hands. He also touched her "butt" and feet with his "wiener."

¶ 14    On cross-examination G.S. said that she slept in one of the loft beds while the other boys slept in the other one. G.S. agreed that the beds were so close together that someone in one bed could see what was happening in the other bed. She also said that Andrew put her feet in his mouth, but she denied that he ever kissed her on the lips.

¶ 15    Andrew, who was 12 years' old at the time of the incident, testified that he did not remember either G.S. or defendant being in the boys' bedroom on the night of September 17, 2011. He did not recall having a conversation with his Aunt Karlene the next morning about having G.S.'s feet in his mouth.

¶ 16    Thomas, who was 11 years' old at the time, testified that G.S. was in the bedroom with him, Kayla, Jack, Graham, Noah and Andrew. Defendant told them it was time for bed. After that, Thomas did not see defendant in the bedroom again. Thomas did not see any unusual contact between G.S. and defendant.

¶ 17    Jack, who was 9 years' old at the time, testified that he was in the loft bedroom with G.S., Kayla and his other cousins and defendant. He was in one of the lofted beds with Graham and Noah, and G.S. was in the other lofted bed while the children watched a movie. Jack saw defendant

lying down in the lofted bed with G.S. for half of the movie. Jack did not see any contact between defendant and G.S.

¶ 18    Kendra testified that she returned home around 1:00 a.m. on September 18, 2011, and found Graham and Jack asleep in one of the lofted beds while G.S. and Andrew were playing video games on the floor. Andrew was lying on his back and G.S. was lying on top of him. Andrew then returned to his bedroom on the main floor and G.S. climbed into the other loft bed. Defendant and Noah were asleep in the master bedroom. She and defendant commonly rubbed lotion on Noah's feet to calm him down at bedtime. Karlene arrived around 9:30 a.m. the next morning and followed Kendra into the room with the lofted beds. Kendra saw G.S. crawling on Andrew. Andrew asked Karlene to tell G.S. to stop jumping on him. G.S. hugged everyone goodbye and she and Karlene left.

¶ 19    Karlene testified that when she arrived at Kendra's house to pick her children up the next morning at 9:00 a.m., she found G.S. and Andrew playing video games in the loft bedroom. Karlene saw Andrew sucking on G.S.'s feet. She told them that was inappropriate and she and G.S. left the bedroom. When leaving the house, G.S. initially refused to hug defendant, but then did so after Karlene told her that she was being rude. On the way home, Karlene scolded G.S. for allowing Andrew to suck her toes and talked to her about good and bad touches. G.S. became hysterical and began crying. She then told Karlene that defendant had sucked on her toes, rubbed his penis against her feet, licked her anus and vagina, and inserted his fingers into her anus and vagina.

¶ 20    The first trial ended with a mistrial after the jury deadlocked.

¶ 21                                B. Second Trial

¶ 22    The second trial began on January 7, 2014. At trial, G.S. described the lofted beds and said that she was in one bed and Graham, Andrew, Thomas and Noah were in the other bed. At one point defendant climbed into her bed and rubbed his "wiener" with her feet.  He licked her feet, touched the top of her vagina with his hand and licked her anus.  She denied any penetration or that defendant ever "blew raspberries" on her belly.  When her mother picked her up the next day, Andrew was not in the loft bedroom.

¶ 23    Karlene and Kendra's testimony was similar to their testimony from the first trial.  Andrew and Thomas testified for the defense, and their testimony was also similar to their testimony in the first trial.

¶ 24    Elba Karim, who was not a witness in the first trial, testified that she was licensed as a clinical professional counselor.  She had a master's degree in human development and an "ABD Ph.D." in marriage and family therapy.  Karim explained that an "ABD Ph.D." stood for "All but Done." It meant that her coursework for that degree was completed, but she had several chapters left of her dissertation to write. She taught sociology, psychology and ethics at two different universities.

¶ 25    As a therapist with a certification as a trauma clinician, Karim had been qualified to testify as an expert on five prior occasions, and had testified as an expert in child development, trauma, childhood trauma, parenting, attachment, child psychology and child and family interactions. She estimated that she had treated between 650 and 675 children in the field of child psychology and trauma.  At the time of her testimony Karim was a therapist and clinical director at StillWaters Behavioral Health. The State tendered Karim as an expert in child psychology. The defense did not object, and the trial court "determined [Karim] to be an expert in the area of child psychology with an emphasis on trauma."

According to Karim, children like G.S. who have Asperger's have difficulty with abstract thinking, reading facial expressions, and understanding emotions. Karim said that G.S. followed social cues well but had difficulty understanding metaphors. G.S. also had Attention Deficit Hyperactivity Disorder (ADHD). Karim further testified that children who have experienced trauma suffer from a variety of symptoms, including anxiety, sleep disturbances, nightmares, ruminating thoughts, intruding thoughts, and difficulty with self-regulation. Karim treated G.S. from the fall of 2011 through March or April of 2014. During that time, G.S. exhibited symptoms of trauma, including sleep disturbances, nightmares, fidgeting, facial tics, and severe anxiety. G.S. also expressed concern about how court would affect her life. Karim diagnosed G.S. as suffering from Post-Traumatic Stress Disorder (PTSD).

¶ 26 On cross-examination, Karim said it was fair to say that since she had never observed G.S. before the incident in question, she did not have a baseline as to how G.S. would have presented before the event. However, Karim said that she had been in practice a long time and had been working with children who had experienced trauma for over 20 years, so she felt that she was pretty good at observing children's symptoms.

¶ 27 During closing argument, the State referred to Karim's testimony about G.S. and specifically how Karim had diagnosed G.S. with PTSD, and argued that the trauma G.S. had suffered was due to the defendant's abuse of her. The jury found defendant guilty of all four counts and his motion for a new trial was denied.

¶ 28 C. Postconviction Petition

¶ 29 On October 19, 2016, defendant filed a postconviction petition. In the petition he raised two issues: (1) actual innocence; and (2) ineffective assistance of trial counsel.

¶ 30     Defendant's actual innocence claim was premised upon an affidavit from Andrew that was attached to the petition. Defendant contended that if the court believed the claims set out in Andrew's affidavit, those claims refuted G.S.'s allegations and irrefutably established his actual innocence.

¶ 31     In the affidavit Andrew stated that he was 18 years' old.  On the evening in question he played with his brothers and cousins, primarily in the loft bedroom and the living room.  At some point late that night while he, Thomas, G.S., Graham and Jack were in the loft bedroom playing video games, defendant walked into the room and told everyone it was time to go to sleep.  After defendant left the room, Thomas also left the bedroom and went downstairs. Graham and Jack climbed into one of the lofted beds.  Noah was not in the room at that time.  G.S. and Andrew continued to play video games.  Andrew said that at no time after defendant came in the room to tell them to go to bed did he or G.S. leave the room. Andrew said that he did not fall asleep.  Some time after Graham and Jack fell asleep, he ended up lying on the floor of the bedroom on his back. G.S. was laying on top of him, with her back on his stomach.  G.S. was rubbing back and forth. At the time Andrew was curious about what they were doing, but he did not know what they were doing was wrong. While this was happening, Andrew's mother walked into the room. His mother told G.S. to get up into bed, and she told Andrew to go downstairs to his bedroom on the main floor. Andrew's mother then came into his bedroom and told him that she saw what he and Grace were doing, and it was inappropriate. He did not recall the details of that brief conversation, but he did generally remember his mother talking with him about appropriate and inappropriate touching.  Andrew said that at no time prior to his mother coming home did defendant ever get into one of the lofted beds with G.S. or have any kind of sexual contact with her. Andrew said that the following morning he was in the lofted bedroom playing video games when G.S. put her foot

in his mouth. At that time G.S.'s mother walked into the room. She saw G.S. with her foot in Andrew's mouth, and they both left. Sometime later he learned that defendant was accused of inappropriately touching G.S. during the night of September 17, 2011.

¶ 32    Andrew said that prior to the first trial he spoke to defendant's attorney and provided him the same information that was contained in his affidavit. Defense counsel told Andrew that he would call him as a witness. Defense counsel did not have him practice his testimony before trial. Andrew said that he did not want to testify, and by the time he was called to testify he felt ashamed and embarrassed about what G.S and he had done that night. He did not want to be asked questions about it. He did not want to be looked at as a "pervert." He was very nervous when he testified, and he wanted to get off the stand as quickly as possible. Though he testified at the first trial that he only had a vague memory of the last night G.S. was at his house, that testimony was not true. While he did not remember every detail of what happened, he did remember defendant coming into the loft bedroom and telling everyone to go to sleep, that he was awake with G.S. after defendant left the room and having G.S.'s foot in his mouth when his mother came home. Andrew further averred that his testimony that he did not remember G.S. sticking her foot in his mouth was also false.

¶ 33    Andrew's affidavit further provided that between defendant's first and second trial he again spoke with defense counsel. Counsel told him that he was going to call him to testify again, but that he did not want Andrew to "submerge" or "submarine" the case. Andrew did not know what counsel meant. At the second trial he testified that he did not really play with G.S. that night and that his brother Thomas and he slept alone in the lofted beds. He also testified that he did not remember seeing G.S.'s mother or speaking with her the following morning. Andrew averred that testimony was also not true. He did play with G.S. that evening, and neither Thomas nor he slept

in that room that night. Also, he recalled the circumstances under which he saw and spoke to G.S.'s mother the following morning.

¶ 34　Apart from the actual innocence claim, defendant's post-conviction petition also raised ineffective assistance of trial counsel on four grounds: (1) counsel's failure to challenge the reliability and validity of the State's expert, Elba Karim; (2) counsel's failure to consult an expert in the field of child psychology; (3) counsel's failure to call that defense expert as a witness; and (4) counsel's failure to subpoena G.S.'s counseling records generated prior to Karim's treatment of G.S.

¶ 35　Defendant attached a report from Dr. Christofer Cooper, Ph.D., ABPP, in support of the petition, which indicated as follows.  Dr. Cooper was a board-certified forensic psychologist who opined that Karim's diagnosis and clinical conclusion that G.S. suffered from PTSD from having been sexually abused was invalid.  He noted that Karim was tendered as an expert in child psychology even though she was not a psychologist and therefore she lacked the qualifications to testify as an expert in that field. Though Karim's treatment records included notes about a conversation that she had with a prosecutor on September 12, 2013, where she reminded the prosecutor that she was not qualified as an expert in Asperger's syndrome, she was nevertheless allowed to provide expert testimony regarding Asperger's and how it affected G.S.'s ability to communicate.  Cooper said in his professional experience conducting forensic psychological examinations and providing expert testimony, he would have expected defense counsel to get Karim to admit that she was not acting as a forensic expert, *i.e.*, an objective evaluator of G.S.'s mental state.  Instead, Karim acted as G.S.'s therapist and advocate, simply assuming that the alleged abuse occurred.  None of these biases, however, were pointed out to the jury. Finally, Cooper noted that despite knowing that G.S. had Asperger's and ADHD, trial counsel had failed

to obtain prior treatment records to challenge Karim's clinical diagnostic assessment that G.S. had PTSD as a result of the alleged abuse.

¶ 36 Regarding G.S's prior treatment records, defendant noted that trial counsel was aware that prior to the date of the alleged abuse, G.S.'s mother had taken her to an anxiety specialist, Adrienne Ahlquist, for anxiety. Defendant alleged that trial counsel's failure to obtain the records was prejudicial because there was a reasonable probability that the records could have been used to undermine Karim's testimony that these symptoms arose from defendant's alleged abuse. When defendant filed his postconviction petition he also filed a motion for discovery. Among other requests, defendant asked for leave to subpoena the records of Ahlquist and Dr. Nancy Keck, another doctor who had treated G.S. for anxiety, for an *in camera* inspection and possible tendering.

¶ 37 Defendant's petition was docketed and advanced to the second stage. The court also granted defendant leave to subpoena Ahlquist and Dr. Keck's treatment records. The providers sent the documents to the court and, after reviewing them, the court tendered the records to the parties.

¶ 38 Defendant reviewed the records and then filed an amended postconviction petition. In that petition defendant attached G.S.'s records. Those records indicated that G.S. and her mother were involved in a motor vehicle accident in December 2008. The records reflected concerns about G.S. suffering from bedwetting, poor memory, nightmares, lack of impulse control, poor attention span, daily irritability, avoidance of thoughts or feelings of trauma, trembling or shaking, nausea and other abdominal stress. Ahlquist's diagnostic impression was that G.S. was suffering from PTSD and she recommended weekly cognitive behavioral therapy.

¶ 39    The amended petition also attached an addendum to Dr. Cooper's prior report. Generally, Dr. Cooper believed that the records established that G.S. had a pre-existing diagnosis of PTSD of which Karim was unaware.  Dr. Cooper said that this further undermined the validity of Karim's testimony. The records showed that G.S. was suffering from many of the symptoms the State attributed to the alleged abuse before defendant allegedly abused her. The records also showed that G.S. never received treatment for those symptoms.

¶ 40    In the amended petition defendant added the allegation that trial counsel was ineffective for failing to consult with and call an expert to challenge the reliability and validity of Karim's conclusion; for failing to subpoena records to undermine Karim's opinions; and otherwise failing to properly impeach and challenge the State's case.  Those failures prejudiced him because the records would have significantly undermined the evidence the State relied on to corroborate the alleged abuse.

¶ 41    The State filed a motion to dismiss the amended petition and defendant filed a response to the motion. In a supplemental response in opposition to the State's motion to dismiss, defendant attached an affidavit from his trial counsel, Robert Nolan.  In the affidavit, Nolan averred that Andrew originally told him that he was awake and with G.S. from the time the other children went to sleep until his mother arrived home.  Andrew also said that at no point did he observe defendant come into the room and abuse G.S. When Andrew testified at trial, though, he said that he did not think he was playing video games with G.S. that night. He said that he slept in one of the lofted beds that evening, and Thomas slept in the other lofted bed. Nolan said that Andrew did not testify consistently with what he told Nolan prior to trial, and his testimony was very damaging to defendant's case. However, Nolan did not have a written statement from Andrew, so he could not

impeach him, and he therefore lacked the ability to compel Andrew to testify consistently with what he had told Nolan before trial.

¶ 42   The trial court granted the State's motion to dismiss defendant's claim of actual innocence because the substance of Andrew's affidavit was not newly discovered evidence. The trial court denied the State's motion to dismiss the ineffective assistance of counsel claims and held them over for a third-stage evidentiary hearing, where the following additional evidence was presented.

¶ 43   At the third-stage hearing, Ahlquist, a licensed clinical social worker, testified that she treated G.S. in February 2009 and diagnosed her as having PTSD at that time.

¶ 44   Dr. Cooper testified regarding his extensive qualifications and experience as a forensic psychologist. He had been qualified in court as an expert in the field of forensic psychology approximately 269 times. The court accepted him as an expert.

¶ 45   Dr. Cooper said that he had reviewed Karim's curriculum *vitae* (CV), the records relating to her treatment of G.S., Karim's trial testimony, Karlene and G.S.'s trial testimony and the records that Ahlquist had supplied to the court. Dr. Cooper had several areas of concern regarding Karim's trial testimony. Although she was tendered and accepted at trial as an expert witness in child psychology, she was not, in fact, a psychologist. Karim was not trained as a psychologist and she did not have her bachelor's or master's degrees in that field. A person must be licensed as a psychologist in Illinois to refer to herself as one.

¶ 46   It was Dr. Cooper's opinion that Karim and the State misleadingly portrayed Karim's credentials in other ways. She testified that she had and "ABD Ph.D.," which suggested that she was actively working toward a Ph.D. degree. However, Dr. Cooper said that Ph.D. candidates must typically finish their coursework within 8 years, absent an extension, to be Ph.D. eligible, which Karim did not do. However, this was never pointed out to the jury. Also, Karim's area of

study for her Ph.D., "marriage and family therapy," was not a field that would have made her eligible to be a licensed psychologist in Illinois, even if she had completed her Ph.D.

¶ 47    Karim was also not qualified to diagnose G.S. as suffering from PTSD as a psychologist. Further, Asperger's syndrome and ADHD had overlapping symptoms with PTSD, including anxiety and difficulty with maintaining appropriate behavior. Even for a clinical psychologist, differentiating between G.S.'s preexisting psychiatric diagnoses and a potential diagnosis of PTSD would be a very complex endeavor. There was no evidence in Karim's notes that she ever tried to differentiate among those disorders as the cause of G.S.'s symptoms.

¶ 48    Dr. Cooper testified that while looking through Karim's notes he noticed on the second page of the intake summary dated September 21, 2011, there was a typed section labeled "initial diagnosis" and next to that was "PTSD." However, September 21, 2011 was the date that Karim saw G.S. for the first time. Karim's last session with G.S. in 2011 was on November 8, and she did not see G.S. again until March 7, 2012. A four-month gap between appointments would be contraindicated because a patient with PTSD could get significantly worse over this length of time without treatment.

¶ 49    Regarding Ahlquist's records from 2009, Dr. Cooper said that the questionnaire presumably filled out by G.S.'s mother indicated that G.S. was experiencing many symptoms that were consistent with PTSD. Ahlquist's notes had "incredible implications" because they established that G.S. had been diagnosed with PTSD long before this case. PTSD can persist and a patient may suffer a triggering event years after the traumatic experience that can cause symptoms to resurface.

¶ 50    Dr. Cooper was also concerned that Karim served in a "dual relationship" where she testified as G.S.'s therapist and therefore her advocate, but also acted as an expert witness. He

testified that the distinction was important because a forensic expert makes an objective diagnosis and a therapist does not.

¶ 51   Robert Nolan, defendant's trial attorney, testified that the State disclosed Karim as an expert witness in child psychology. He was aware prior to trial that Karim's notes indicated that G.S. had PTSD.  He knew before trial that the State might introduce evidence of G.S.'s mental state after the alleged abuse. Nolan conceded that he should have obtained G.S.'s prior treatment records but did not. He could not think of a strategic reason for not consulting with a psychologist to address Karim's possible trial testimony. When asked whether he would have wanted to know that G.S. had been diagnosed with PTSD prior to the alleged abuse, Nolan said that he had always thought that defending child sex cases was difficult and he always tried to stay away from "dirtying up" the victim. He did not think the State could prove its case against defendant and he thought they could win on that basis alone.

¶ 52   The State called Karim in rebuttal. She testified that she was licensed in Illinois as a professional clinical counselor and she provided mental health, trauma-based services. Her licensure allowed her to make mental health diagnoses like PTSD. She admitted that she never finished a Ph.D. program to become a psychologist. She did all the course work, the internship and the exam and had finished two chapters of her dissertation.

¶ 53   Most of Karim's work had been with children and families who had experienced trauma. She treated G.S. for about a year and a half. As the treatment progressed, G.S.'s trauma became less debilitating. G.S. told Karim that she had been sexually abused by her mother's boyfriend, whom G.S. referred to as her uncle at the time. If Karim had known that G.S. had been previously diagnosed with PTSD that would not have changed her diagnosis, since a person could suffer from PTSD more than once. There is a greater risk of PTSD upon multiple exposures to trauma.

¶ 54    On cross-examination Karim admitted that although she testified at the second trial that G.S. suffered from "lots and lots of anxiety," her notes did not reflect the same, instead indicating that G.S. was "slightly anxious." In her notes of other sessions Karim did not use the word "anxiety," however her session notes did reflect that G.S. attempted to avoid talking about the sexual abuse. In other sessions Karim noted that G.S. was "much less anxious." In March 2012, Karim noted that G.S.'s mother reported that G.S. had "multiple issues with anxiety" and possible self-stimulation. However, Karim's notes also showed that G.S.'s mother had recently had surgery and that G.S. was anxious about the surgery.

¶ 55    Karim also acknowledged testifying that G.S. had "lots and lots of nightmares." Although some of her notes indicated that G.S. denied having nightmares, other notes showed that G.S. had recurring and intrusive thoughts as well as additional thoughts about defendant abusing her, especially at night.  In her notes of August 23, 2012, Karim noted, "[s]ome nightmares of abuse but getting better."

¶ 56    Karim agreed that at trial the State offered her as an expert in the field of child psychology and trauma. She also agreed that she was not eligible to be a licensed psychologist in Illinois. She acknowledged that she described herself to the jury as "ABD Ph.D." She said that she had completed the course work and exam, but that she most likely had run out of time and had not received an extension of time to complete her dissertation.

¶ 57    Karim said that although she is a therapist, she does not always view herself as an advocate. Instead, she sees her role as to help her patients through treatment to get better. She admitted that she had conversations with law enforcement and the State about this case and that she had been referred to G.S.'s mother by the DeKalb County Child Advocacy Center. G.S. and her mother had asked her questions about what would be asked of them at trial. She also talked to the prosecutor

about how to get the most information from G.S. at trial because she was not good at understanding metaphors.

¶ 58    When asked to agree that she had only diagnosed G.S. with PTSD from the standpoint of a therapist and not a psychologist, Karim countered that therapists and psychologists use the same criteria for making mental health diagnoses under the Diagnostic and Statistical Manual of Mental Disorders. She did not consider herself an expert in Asperger's syndrome or ADHD. She disagreed that someone would have to have expertise with those disorders to differentiate between them. Regarding her PTSD diagnosis for G.S., Karim noted that she had taken classes, had ongoing supervision, and took continuing education units to hone her diagnostic skills.

¶ 59    In denying relief on defendant's ineffective assistance of counsel claims, the postconviction court summarized all the evidence at the hearing and then said:

> "At the end of the day the court must look at the evidence to see if it overcomes the strong presumption of strong trial strategy even when there are errors during the course of the trial and whether or not this evidence shows that a reasonable probability of a different outcome if they had not been made.

> Given the limitations on Karim's testimony, which included not identifying the trauma to a specific child abuse event or identifying a specific perpetrator, the attorney's strategy to not highlight her opinion by digging deeper into the details is a trial strategy that would allow him to focus on the lack of physical evidence or eyewitness testimony that he felt was the strength of his case even though it would leave unchallenged some of the flaws of Ms. Karim's testimony."

¶ 60    The court said that a trial without errors did not exist, and it could not say that the errors in this case created the "necessary, reasonable probability" of altering the outcome that was required here. It then denied the petition.

¶ 61    When asked by defense counsel whether it was the court's understanding that Nolan testified that he had a strategy of not emphasizing Karim's testimony, the court said that it was not. The court noted that it went "a little off the reservation" in determining what a reasonable probability meant. It noted that having sat in Nolan's chair over a hundred times in trying different criminal cases in front of juries, the court sensed that Nolan's focus was on the lack of evidence. Sometimes an attorney did not want to ask a question to which he did not know the answer, and in that case, he would  "leave it alone" even though he could have cross-examined a witness on a particular issue. The court found those experiences to be consistent with Nolan's strategy of relying on the lack of sufficient evidence to support a conviction beyond a reasonable doubt.

¶ 62    Defense counsel also asked the court to clarify if its ruling also pertained to Nolan's failure to conduct an investigation to determine whether there were records of G.S. having a pre-existing diagnosis. The court said that Nolan admitted that he did not do such an investigation even though at the 115-10 hearing it was determined that G.S. had had prior counseling with Ahlquist, which the court said was error. The court continued:

    "I'm not suggesting that within the use of his trial strategy [Nolan] couldn't have done things differently and *** failure to get those records which was included was an error. Failure to consult an expert in the field of child psychology was an error, but errors by themselves don't create a reasonable probability that the result would have been different."

¶ 63    Finally, the court summarized its findings:

"You raised four issues. Failure to challenge the reliability and validity of the State's expert. I'm saying that could be certainly part of trial strategy. Failure to consult an expert in the field of child psychology. That I think is more an error—failure to call a defense expert. That could just fall under the umbrella of trial strategy as well. And failure to subpoena counseling records generated prior to the treatment by therapist Karim, not only do I think that was error, I think that's what Mr. Nolan testified to in effect at that hearing, that he should have done that."

¶ 64                                    II. ANALYSIS

¶ 65    Defendant appeals from the trial court's order granting the State's motion to dismiss his actual innocence claim at the second stage of the postconviction proceeding, as well as the denial of his ineffective assistance of counsel claims after the third-stage evidentiary hearing.

¶ 66    The Postconviction Act provides a remedy to a criminal defendant whose federal or state constitutional rights were substantially violated at trial or sentencing. *People v. Dupree*, 2018 IL 122307, ¶ 28. If the postconviction petition is not dismissed at the first stage as frivolous or patently without merit, it advances to the second stage where the State may either answer the petition or move to dismiss it. *Id*. If the State moves to dismiss the petition, the postconviction court must decide whether to grant the State's motion or advance the petition to the third-stage evidentiary hearing. *Id*.

¶ 67    At the second stage, the inquiry into whether a post-conviction petition contains sufficient allegations of constitutional deprivations does not require the postconviction court to engage in any fact-finding or credibility determinations. *Id*. at ¶ 29. At that stage, the court examines the petition to determine its legal sufficiency, and any allegations not affirmatively refuted by the record are taken as true. *Id*. Thus, the substantial showing of a constitutional violation that must

be made at the second stage is " 'a measure of the legal sufficiency of the petition's well-pled allegations of a constitutional violation, which if proven at an evidentiary hearing, would entitle [defendant] to relief.' " (Emphasis omitted.) *Id.* (quoting *People v. Domagala*, 2013 IL 113688, ¶ 35). When a postconviction petition is dismissed at the second stage, our review is *de novo*. *Id.*

¶ 68    A postconviction petitioner is entitled to an evidentiary hearing only when the allegations in his petition are supported by affidavits, records, or other evidence to make a substantial showing of a deprivation of rights under either the United States or Illinois Constitutions or both. *Dupree*, 2018 IL 122307, ¶ 28. When a petition advances to an evidentiary hearing and fact-finding and credibility determinations are involved, this court will not reverse the circuit court's decision unless it is manifestly erroneous. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). A manifest error is one that "is clearly evident, plain, and indisputable." *People v. Ruiz*, 177 Ill. 2d 368, 384-85, 686 N.E.2d 574, 582 (1997).

¶ 69                                A. Actual Innocence

¶ 70    Defendant argues that the trial court erred in dismissing his claim of actual innocence at the second stage because the facts set forth in Andrew's affidavit attached to his petition constituted "new evidence" which, if believed, would establish defendant's innocence such that relief is required.   Defendant  also submitted an affidavit from Nolan who averred that Andrew told him that he was awake and with G.S. from the time the other children went to sleep until his mother arrived home, but then he failed to testify to that fact at either trial.

¶ 71    The due process clause gives postconviction petitioners the right to assert a freestanding claim of actual innocence based on newly discovered evidence. *People v. Ortiz*, 235 Ill. 2d 319, 333 (2009). The evidence in support of the claim must be newly discovered; material and not merely cumulative; *and* be so conclusive that the result on retrial would probably change. *Id.* New

means that the evidence was discovered post-trial and could not have been discovered earlier through the exercise of due diligence. *People v. Coleman*, 2013 IL 113307, ¶ 96. Material means that the evidence is probative and relevant to defendant's innocence. *Id*. "Evidence which is 'materially relevant' to a defendant's claim of actual innocence is simply evidence which tends to significantly advance that claim." *People v. Robinson*, 2020 IL 123849, ¶ 55 (quoting *People v. Savoy*, 197 Ill. 2d 203, 213 (2001). Noncumulative means that the evidence adds to what the jury heard. *Id*. An actual innocence claim is "extraordinarily difficult to meet." *Id*. ¶ 94.

¶ 72    Even if we were to agree for argument's sake that Andrew's affidavit constituted new evidence, we find that defendant's claim fails because Andrew's statements do not present a substantial showing of actual innocence. Newly discovered evidence which merely has the effect of impeaching, discrediting, or contradicting a witness does not afford a basis for a new trial. *People v. Wingate*, 2015 IL App (5th) 130189, ¶ 24. Although the trial court may not engage in fact-finding or credibility determinations during second-stage proceedings, neither is necessary to conclude that Andrew's affidavit goes toward credibility determinations that relate to reasonable doubt rather than actual innocence. *People v. Calhoun*, 2016 IL App (1st) 141021, ¶ 30 (claims of actual innocence do not exist within the rubric of challenging the sufficiency of the evidence). We agree with the State that if defendant were retried, Andrew's affidavit statements would be weighed against the other evidence at trial, including G.S.'s testimony along with the video of G.S. at the hospital and her interview at the Children's Center. Moreover, Andrew could be impeached with his prior inconsistent testimony at *two trials*. Accordingly, the trial court did not err in granting the State's motion to dismiss defendant's actual innocence claim at the second stage of the proceedings.

¶ 73                                B. Ineffective Assistance of Counsel

¶ 74    Next, defendant argues that the postconviction court erred in denying his claim of ineffective assistance of trial counsel after a third-stage evidentiary hearing, where he claimed his trial counsel was ineffective for failing to: (1) subpoena G.S.'s prior treatment records; (2) consult with an expert to review all the treatment records and the state's expert witness, Karim; and (3) challenge Karim's trial testimony.[1]

¶ 75    In reviewing the trial court's third-stage ineffective assistance of counsel rulings, we first must decide the applicable standard of review.  As we have noted, where the trial court advances a postconviction petition to a third-stage evidentiary hearing where fact-finding and credibility determinations take place, this court will not reverse the circuit court's decision unless it is manifestly erroneous. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). On the contrary, if no such determinations are necessary at the third stage, *i.e.*, no new evidence is presented and the issues involved are pure questions of law, we will generally apply a *de novo* standard of review.  *Id*. Here, the postconviction court heard the testimony of Ahlquist, Dr. Cooper, defense counsel Nolan, and G.S.'s Aunt Kendra, after which the State presented the additional testimony of Karim. The trial court actively participated in cross-examination and made factual and credibility findings such that we review the trial court's third-stage ineffective assistance of counsel rulings for manifest error. *Id*.  A manifest error is one that "is clearly evident, plain, and indisputable." *People v. Ruiz*, 177 Ill. 2d 368, 384-85 (1997).

¶ 76    To prevail on a claim of ineffective assistance of counsel, a defendant must show: (1) counsel's performance fell below an objective standard of reasonableness; and (2) the deficient

---

[1] On appeal defendant does not claim that trial counsel was ineffective for failing to call a defense expert.

performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To satisfy the deficiency prong, a defendant must show his counsel's performance was so inadequate that it fell below an objective standard of reasonableness, and it must overcome the strong presumption that any challenged inaction may have been the product of sound trial strategy. *People v. Dupree*, 2018 IL 122307, ¶ 44; *People v. Domagala*, 2013 IL 113688, ¶ 36. To establish prejudice, the defendant must show there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Phillips*, 2017 IL App (4th) 160557, ¶ 57. The prejudice prong is satisfied if the defendant can show counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair. *Id.* The failure to satisfy either the deficiency prong or the prejudice prong precludes a finding of ineffective assistance of counsel. *Strickland*, 466 U.S. at 697; *People v. Houston*, 226 Ill. 2d 135, 144–45 (2007).

¶ 77                              1. Objective Standard of Reasonableness

¶ 78     Turning to the ineffective assistance of counsel claims of defendant, we agree with the postconviction court's determination that trial counsel's performance fell below an objective standard of reasonableness when he failed to obtain G.S.'s prior records and consult with an expert regarding the same. Counsel had a professional duty to conduct reasonable investigations or make a reasonable decision that an investigation was unnecessary. *Domagala*, 2013 IL 113688, ¶ 38. Prior to defendant's second trial, the State notified the defense that it intended to call Karim as an expert in the field of child psychology and therapy. The State provided Karim's CV as well as the notes of her sessions with G.S. and her statements to law enforcement. The notes indicated that G.S. was referred to Karim for allegations of sexual abuse by "an uncle." Karim diagnosed G.S. as having PTSD. Also, Nolan knew that G.S. had a history of mental health treatment and had been

treated for anxiety by Ahlquist before the alleged incident. Similarly, counsel also knew that G.S. had been previously diagnosed with Asperger's syndrome. Considering all this information, it was incumbent upon Nolan to obtain G.S.'s medical records. Such evidence could potentially invalidate or weaken the State's contention that G.S.'s claims of abuse were substantiated by her PTSD diagnosis. Also, given G.S.'s complex mental health history, a reasonable investigation would have required trial counsel to consult with an expert to explore the validity of Karim's anticipated testimony. Indeed, even trial counsel conceded at the evidentiary hearing that he had no strategic reason for not performing an investigation and he admitted that he should have obtained G.S.' s prior records. Accordingly, the postconviction court's determination that counsel's performance fell below an objective standard of reasonableness was borne out by the record.

¶ 79    We do not, however, share the postconviction court's assessment that trial counsel's negligible cross-examination of Karim was an objectively reasonable strategic decision. The court concluded that since Karim did not testify to a specific sexual abuse event or perpetrator, Nolan's strategy to not highlight Karim's opinion allowed him to focus on the lack of physical evidence or eyewitness testimony. Quite apart from the merits of such a strategy, the trial court's decision here is manifestly erroneous in part because there was no testimony in the record from which to ascribe that strategy to trial counsel. Indeed, trial counsel testified at the third-stage evidentiary hearing that he could not recall any strategic reason underlying his cross-examination, or lack thereof, of Karim. Thus, the trial court should not have ventured and relied upon a *post hoc* trial strategy of its own making. Cf., *Harris v. Reed*, 891 F. 2d 871, 878 (1990) (citing *Kimmelman v, Morrison*, 477 U.S. 365, 386 (1986)) ("Just as a reviewing court should not second guess the strategic

decisions of counsel with the benefit of hindsight, it should also not construct strategic defenses which counsel does not offer.")

¶ 80     Turning to the merits of defendant's claim that his trial counsel's cross-examination of Karim fell below an objectively reasonable standard, defendant observes that his counsel failed to cross-examine Karim on: her education and credentials; her lack of expertise in Asperger's syndrome and child psychology; her lack of objectivity as G.S.'s therapist; her premature diagnosis of G.S. with PTSD; her pre-trial communication with the prosecution, including her advice to the prosecution about how to examine G.S. at trial and asking the prosecution to give her a list of questions in anticipation of trial; the fact that G.S.'s mother asked Karim how she should testify at trial; her lack of qualification to differentiate between Asperger's syndrome, ADHD and PTSD; that G.S. would be difficult to diagnose with PTSD given her complicated mental health history; that her notes did not support her testimony that G.S. suffered from "lots and lots" of anxiety and nightmares; that G.S. went four months without any treatment shortly after the alleged abuse; and that Karim did not obtain Ahlquist's notes before trial and therefore learn that G.S. had previously been diagnosed with PTSD.

¶ 81     Although we may not agree with each and every shortcoming identified above, on balance we find that Nolan's almost total failure to cross-examine Karim fell below an objective standard of reasonableness. Nolan did not question Karim's credentials in any way, including what it meant that she was an "ABD Ph.D." If he had, he might have elicited testimony from her that the time the frame for her to finish her Ph.D. had expired, which may have hurt her credibility with the jury. Likewise, this would have emphasized to the jury that Karim was not a licensed psychologist, though the court found her to be an expert in child psychology.  He also did not cross-examine Karim that she was testifying as both an expert *and* as G.S's therapist, potentially calling into

question her objectivity. Although Nolan had Karim's notes before trial, he also did not question that they appear to suggest that Karim diagnosed G.S. with PTSD before she had met her. Finally, Nolan did not cross-examine Karim as to why G.S went approximately four months without any treatment after Karim met G.S. the first time. Certainly, these deficiencies fell below an objective standard of reasonableness. Accordingly, defendant has satisfied the first prong of the *Strickland* analysis for all his ineffective assistance of counsel claims. *Strickland*, 466 U.S. at 687.

¶ 82    2. Whether defense counsel's deficient performance prejudiced the defense

¶ 83    We must next consider whether the deficient performance identified above prejudiced the defendant such that he is entitled to a new trial. Where counsel's performance was in fact deficient, a defendant will only be entitled to relief if he shows there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Stated otherwise, defendant must show by a preponderance of the evidence that there is a reasonable probability he would have been acquitted but for the deficiencies in counsel's performance. *People v. Makiel*, 358 Ill. App. 3d 102, 105-06 (2005). A reviewing court must not consider the attorney errors in isolation, but instead must assess how the errors fit into the big picture of what happened at trial. *Id.* at 696. "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.*

¶ 84    Defendant initially notes that the first trial resulted in a deadlocked jury and argues that Karim's testimony at the second trial was the only significant difference between the two trials. First, we note that a deadlocked jury in a previous trial is not a determinative factor in deciding the closeness of the evidence. Cf., *People v. Rottau*, 2017 IL App (5th) 150046, ¶¶ 78-79 (that the

jury was initially deadlocked and sent some notes out to the trial court did not show that the evidence was so closely balanced that the scales of justice had been tipped against defendant).

¶ 85    Defendant argues further that the evidence here was closely balanced based upon *People v. Stevens*, 2018 IL App (4th) 160138, which found that corroboration in the form of expert testimony that a child displays behavioral characteristics consistent with sexual abuse can tip the scales between a not guilty and guilty verdict in a sexual abuse case.  Thus defendant concludes that he would have been acquitted had trial counsel properly challenged the testimony of Karim.  The State counters with its own case, *People v. Choate*, 2018 IL App (5th) 150087, for the proposition that the absence of expert testimony does not always render a circumstantial child sexual abuse case closely balanced.  In the end, however, we look not to the plethora of cases that have decided the *Strickland* question on their own unique facts, but instead to the particular facts introduced at the instant trial, as well as those adduced at the third-stage hearing, and thereby determine whether the trial court's denial of defendant's ineffective assistance of counsel claims was against the manifest weight of the evidence.

¶ 86    It must be noted that Karim's testimony was not the only difference between the two trials. In the second trial, Detective Hoffman, Kendra's son, Jack, and the defendant did not testify. Moreover, at the second trial the video of G.S.'s statement at the hospital was admitted into evidence for the first time.  We have watched that video and find that the second jury could have found it not only reliable, but powerfully corroborative of G.S.'s other statements.

¶ 87    Regarding Nolan's failure to obtain G.S.'s prior records and to consult an expert to further challenge Karim's testimony, our review of the second trial and the third-stage evidentiary hearing demonstrates that the outcome of the trial would not have been different even if Nolan had not made those errors. The major difference between Dr. Cooper's testimony and Karim's testimony

was which traumatic event, the car accident in 2008 involving G.S. and her mother, or the alleged sexual abuse in September 2011, caused G.S.'s symptoms. At the evidentiary hearing, Karim testified that G.S. told her that defendant had sexually abused her and that the abuse happened every time she went to his house, beginning when she was five years' old. At the conclusion of the hearing, the State argued that any additional questioning about G.S.'s PTSD at the second trial might have unearthed the fact that G.S. told Karim that defendant had been abusing her since she was five years' old, which was close in time to when she was diagnosed with PTSD for the first time. That evidence, of course, could have been very damaging to defendant's case. As such, both parties were very careful about the information they presented to the jury. Karim was not questioned about G.S.'s specific statements, and she did not identify defendant as the perpetrator who caused G.S.'s symptoms. Defendant correctly notes that the jury had already heard G.S. tell Heilemeir on the Children's Center video that defendant abused her every time she went to his house, beginning when she was five years old. Although that is true, Karim's testimony would have further damaged defendant's case for the jury to hear that G.S. had consistently repeated this information to Karim after she told it to Heilemeir as well. For these reasons, defendant has not made a substantial showing that there was a reasonable probability that if Nolan had requested G.S.'s prior records or consulted another expert about Karim's anticipated testimony that the outcome of the second trial would have been different.

¶ 88    In concluding that the deficiencies it found in trial counsel's performance vis-à-vis Karim's cross-examination did not create a reasonable probability that the result of the trial would have been different but for the deficiencies, the postconviction court relied in part on our decision on direct appeal, (*People v. Reiss*, 2015 IL App (2d) 140488-U). Specifically, it noted that we did not rely upon Karim's testimony in finding the evidence sufficient to convict, rather mentioning

Karim's testimony in passing. We agree with defendant that our order on direct appeal concerning the sufficiency of the evidence has no bearing on whether, but for trial counsel's deficient performance, a reasonable probability existed that the result of the trial would have been different. However, our subsequent review of the same evidence, in the context of the trial counsel's deficient performance detailed *supra ¶ 79,* leads us to conclude that the postconviction court's finding was not manifestly erroneous that, but for the deficiencies of trial counsel, a reasonable probability exists that result would have been different.

¶ 89    In addition to G.S.'s testimony in the second trial, the jury heard evidence about four previous instances where G.S. related how defendant sexually abused her: G.S.'s initial report to her mother in the car after leaving defendant's home; G.S.'s answer to questions posed by Dr. Davis in the hospital that same day, recorded by her mother; G.S.'s recorded interview by Heilemeir the Children's Advocacy Center; and G.S.'s testimony at the first trial. G.S.'s statements were consistent regarding defendant touching her sex organ and anus with his hand and tongue and defendant placing her feet on his penis. Although G.S. denied digital penetration at the second trial, she related how defendant digitally penetrated her during the Heilemeir interview, which was much closer in time to the incident. In addition to G.S.'s trial testimony and the introduction of her prior statements, the testimony of her mother, aunt, and cousins, collectively, showed that defendant had the opportunity to engage in the abuse testified to by G.S., and specifically placed him in the bedroom where the abuse occurred.

¶ 90    Given the testimony at trial, we now consider whether, but for the various deficiencies in cross-examining Karim, there was a realistic probability that the result at trial would have been different. The first Karim cross-examination deficiency relates to issues regarding her credentials. The trial court found the defendant qualified to testify as an expert in matters of child psychology.

We agree with the State that the trial court correctly recognized the distinction between being a psychologist and being accepted as an expert in the field of child psychology, especially in light of Karim's 20 years of experience in identifying trauma in children. More important, Karim did not testify that she was a child psychologist. She identified herself as a licensed clinical professional counselor with a master's degree in human development and was a certified trauma clinician. She had treated between 650 and 675 children in the field of "child psychology and trauma." She also testified at the evidentiary hearing that she was licensed to diagnose PTSD. Although the State erred in presenting Karim as an expert in the field of child psychology, that error was not compounded by Karim's testimony.

¶ 91    As for Karim's alleged lack of objectivity in testifying as both an advocate and G.S.'s therapist, at the evidentiary hearing Karim testified that she did not view herself as an advocate. Instead, she saw her role as helping her patients to get better through treatment. Regarding her alleged premature diagnosis of G.S with PTSD, although that point was not examined at trial, it is uncontradicted that Karim treated G.S. for a year and a half, and in all that time her diagnosis of PTSD did not change.

¶ 92    As for Karim having contact with the prosecution, we see no error there and defendant does not pinpoint the alleged error. Karim did not testify that she told the State exactly what questions to ask G.S. at trial. Instead, she testified that she gave the State tips on how to get the most information out of G.S. given her Asperger's diagnosis. For example, G.S. had difficulty answering questions that required abstract thinking, so those type of questions may not have elicited a response from her. Karim also did not testify that she told Karlene how to testify at trial; rather, her notes indicated that Karlene was also anxious about the trial process and what she would say when testifying.

¶ 93    Concerning Karim's qualifications to differentiate between the overlapping symptoms of Asperger's syndrome, ADHD and PTSD, Karim acknowledged that the three disorders had overlapping symptoms. As for G.S.'s mental health history and the suggestion that it would be very difficult to diagnose G.S. with PTSD, even for a licensed psychologist, Karim testified at the evidentiary hearing that diagnosing PTSD was done by using the Diagnostic and Statistical Manual of Mental Disorders, and she was just as qualified as a psychologist to diagnose PTSD in a patient. We also disagree with defendant's characterization of Karim's notes not supporting her testimony that G.S. was suffering from "lots and lots" of anxiety and nightmares. Karim was heavily cross-examined about her notes at the evidentiary hearing, and although she did not always use those specific words in her notes, it was clear that G.S. did suffer significantly from both symptoms. Also, even if Karim had obtained Ahlquist's notes and learned that G.S. had previously been diagnosed with PTSD, Karim testified that an earlier diagnosis of PTSD would not have affected her diagnosis. Both she and Dr. Cooper testified that a person could have PTSD at different times in life following different traumatic events. Finally, as for the fact that G.S. went four months without treatment shortly after the alleged abuse occurred, we do not think that fact, standing alone, would be sufficient to change the outcome of the second trial. For all these reasons, we find that even considering Nolan's deficient performance, that performance did not prejudice defendant to the extent that he was entitled to a new trial. Accordingly, the trial court's order denying defendant's ineffective assistance of counsel claims was not against the manifest weight of the evidence.

¶ 94                              III. CONCLUSION

¶ 95    For the reasons stated, the trial court properly granted the State's motion to dismiss defendant's claim of actual innocence at the second stage proceedings when the information

contained in Andrew's affidavit did not constitute a substantial showing of actual innocence. The trial court also properly denied defendant relief on his ineffective assistance of counsel claim after an evidentiary hearing when he could not make a substantial showing that, but for trial counsel's errors, the result of the second trial would have been different.

¶ 96    The judgment of the circuit court of DeKalb County is affirmed.

¶ 97    Affirmed.